UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

COLIN D., a minor, and JOSPEH D.,
individually, and as a guardian of Colin D.,

            Plaintiffs,

       -v-                                              No. 20-CV-9120-LTS-GWG

MORGAN STANLEY MEDICAL PLAN;
OPTUM GROUP, LLC; and UNITED
BEHAVIORAL HEALTH, INC.,

            Defendants.

--------------------------------------------------------x

<u>REDACTED MEMORANDUM OPINION AND ORDER</u>[1]

            Plaintiffs Joseph D. and Colin D. are a father and son who are participants in a

medical plan managed by defendants Morgan Stanley Medical Plan, Optum Group LLC

("Optum"), and United Behavioral Health, Inc. ("UBH") (collectively, "Defendants").  Plaintiffs

bring several causes of action relating to Defendants' denial of coverage for Colin's continued

inpatient mental health treatment, alleging violations of the Mental Health Parity and Addiction

Equity Act (the "Parity Act") (29 U.S.C. § 1185a);[2] and the Employee Retirement Income

Security Act ("ERISA") (29 U.S.C. § 1001 et seq.).[3]  Plaintiffs and Defendants have,

respectively, moved for summary judgment on Plaintiffs' claims.  (Docket entry nos. 51 ("Pls.

---

[1]   This is a redacted version of the Memorandum Opinion and Order filed under seal in this
      case on September 30, 2023.  See Order filed at docket entry no. 103.

[2]   Plaintiffs' Amended Complaint also makes unelaborated references to the Affordable
      Care Act ("ACA") in connection with their ERISA benefit-denial and Parity Act claims.

[3]   Plaintiffs have abandoned their Second and Third Causes of Action, which were asserted
      under the Parity Act and the ACA.  (See docket entry no. 55, at 1 n.1; docket entry no.
      68, at 2 n.1.)

Mem."), 63 ("Defs. Mem".))  The Court has jurisdiction of this action pursuant to 28 U.S.C. section 1331 and 29 U.S.C. section 1132(e).  The Court has considered the parties' submissions carefully and, for the following reasons, grants in part and denies in part Defendants' motion for summary judgment, and denies Plaintiffs' motion for summary judgment.

BACKGROUND

The following factual recitation is drawn from the parties' statements pursuant to S.D.N.Y. Local Civil Rule 56.1,[4] as well as the administrative record that was before Defendants at the time they denied Plaintiffs' claim.[5]  The facts are undisputed unless characterized as party statements, allegations, or assertions.  At all relevant times, Plaintiff Joseph D. was a participant in the Morgan Stanley Medical Plan (the "Plan"), and his son Colin D. was a minor and a beneficiary of the Plan.  (Docket entry no. 56 ¶ 1; docket entry no. 70 ¶ 10.)  The Plan provided coverage for mental health and substance abuse services, and Defendant UBH was "one of the Plan's designated mental health/substance abuse claim administrators."  (Docket entry no. 56 ¶¶ 8, 12–13; docket entry no. 69 ¶ 4.)  The Plan granted UBH "discretionary authority" to "interpret the terms of the Plans and to determine eligibility for an entitlement to benefits under the Plans." (Docket entry no. 69 ¶¶ 6, 7.)  The Plan provided coverage for residential mental health services to the extent that such services were "Medically Necessary," but excluded coverage for mental

---

[4]      Citations to the parties' respective Local Civil Rule 56.1 Statements incorporate by reference the parties' citations to underlying evidentiary submissions.

[5]      "When reviewing claim denials [under ERISA], district courts typically limit their review to the administrative record before the plan at the time it denied the claim."  Halo v. Yale Health Plan, Dir. of Benefits & Recs. Yale Univ., 819 F.3d 42, 60 (2d Cir. 2016) (citation omitted).  The administrative record in this case, which is designated by the parties as "UBH," is cited throughout this opinion, and can be found in full at docket entry no. 72.

health services that "extend[ed] beyond the period necessary for short-term evaluation, diagnosis, treatment, or crisis intervention." (Docket entry no. 69 ¶¶ 8–12.) On October 11, 2018, UBH denied continuing coverage for Colin's treatment at a residential mental health facility from September 29, 2018, onward—a primary issue in this case is whether continued residential treatment was "Medically Necessary" for Colin, within the meaning of the Plan.

Plaintiffs allege that, at various times throughout his childhood, Colin has suffered from mental illnesses that rendered it difficult for him to control his anger and emotions. (Docket entry no. 56 ¶ 19.) His diagnoses have included Intermittent Explosive Disorder; Oppositional Defiant Disorder; Attention Deficit Hyperactivity Disorder, Combined Type; and Major Depressive Disorder. (Docket entry no. 56 ¶ 52; docket entry no. 70 ¶ 52.) Plaintiffs assert that Colin first began therapy in 2010 (when he was 7 years old), when he was treated for anger management and impulsivity. (Docket entry no. 56 ¶¶ 20–22.) Plaintiffs assert that, over the next several years, Colin's parents "attempted to treat Colin's mental illness with many therapists, doctors, and changes to Colin's medication regimen[.]" (Docket entry no. 56 ¶ 23.) In 2016, Plaintiffs state, Colin was suspended from school for 14 days after making threats to his classmates, and was thereafter admitted to a hospital for emergency psychiatric treatment after he had an outburst and threatened to harm himself. (Id. ¶¶ 24–29.) In summer 2017, Plaintiffs state, Colin was removed from a military academy camp program after threatening suicide, and in fall 2017, Colin told a girl online that he wanted to kill himself, a statement that led to a police visit to Colin's home. (Id. ¶¶ 32–38.) Despite these struggles, the record shows that Colin also had some successes in high school—during early 2018, Colin maintained a job working part-time at a pizza restaurant, was involved in some extra-curricular activities, and passed his high school classes. (Docket entry no. 57-61 at 7.) In April 2018, Colin was admitted to a partial

hospital program at Princeton House Behavioral Health, and thereafter began an intensive

outpatient program there.  (Docket entry no. 56 ¶¶ 39–41.)  Defendants covered Colin's

treatment at Princeton House under the Plan.  (Id. ¶ 42.)

On August 1, 2018, Colin was admitted to the ViewPoint Center ("ViewPoint") in

Utah, a short-term inpatient mental health treatment and assessment hospital.  (Docket entry no.

56 ¶ 44; docket entry no. 70 ¶ 44.)  Defendants ultimately approved coverage under the Plan for

Colin's residential treatment at ViewPoint for the entirety of his stay there—from August 1,

2018, until September 25, 2018.  (Docket entry no. 56 ¶ 47.)  Overall, it appears that Colin made

progress while at ViewPoint, but he still had some behavioral issues.  A discharge report

prepared by a treatment provider at ViewPoint on September 26, 2018, described in detail

Colin's mental health status while at ViewPoint.  (Docket entry no. 57-75, at 7–13.)  The report

noted that Colin had a tendency to be "distractible, impulsive and emotionally reactive," and to

make "threatening or at least hurtful remarks to others" when agitated.  (Id. at 7.)  However, the

report also noted that, "[d]espite Colin's profound insecurities and maladaptive ways of

concealing them, he can be incredibly supportive and kind-hearted towards others."  (Id.)  He is

characterized in the report as "very resilient and adaptable," and as a "quick thinker who has

demonstrated strong introspective capacities across therapeutic activities."  (Id.)  The report

noted that, although Colin "still struggles at times" during therapy, overall "he has demonstrated

considerable improvement . . . over the course of his stay at [ViewPoint]."  (Id.)  The report also

noted that "the support that Colin has from his parents" is a "tremendous strength" for his mental

health, which "bodes well for him at this level of his prognosis."  (Id.)

The administrative record also includes details about some of the noteworthy

incidents during Colin's stay at ViewPoint.  On August 8, 2018, Colin punched a wall in

frustration after an argument with a peer, and sustained minor injuries (bruising/strain).  (Docket entry no. 57-75; docket entry no. 72-4, at 104).  On August 10–11, 2018, he was disrespectful to staff and punched a wall again, although staff noted that "this behavior seemed to be attention seeking" more than an attempt to hurt himself.  (Docket entry no. 72-4, at 78, 104.)  In the week following these incidents, Colin reported that he had "wholeheartedly committed himself to doing well" at ViewPoint and also reported feeling in "much better control of his mood."  (Id. at 78, 104.)  During late August and early September, Colin showed improvement and did not display as much "dysregulating behavior," apart from one comment of "wanting to kill someone" on August 23, 2018, which he maintained was a joke.  (Id. at 78–79, 104.)  Due to this comment, Colin was removed from the community to help him calm down; in his frustration regarding this punishment, he punched and kicked a door, but he calmed down shortly afterward.  (Id. at 79, 104.)

Colin had a visit with his parents and grandparents in early September, with no notable issues.  (Docket entry no. 72-4, at 79.)  Records also indicate that, throughout his time at ViewPoint, Colin participated in numerous group outings and activities (such as swimming, skating, going to the park or the movies, etc.), with no notable issues or outbursts, and that he also participated meaningfully in both his group and individual therapy sessions.  (Id. at 97–170.)  Colin did have occasional "verbally antagonistic interaction[s]" with his peers, but also "cultivated [] friendship[s]" during his time there.  (See, e.g., id. at 120.)  As late September approached, Colin was "anxious" when he learned of the plan to discharge him from ViewPoint and into a longer-term residential facility, as he reported "feeling comfortable at [ViewPoint], and expressed that he does not want to leave."  (Id. at 80.)  Upon his discharge, he was "able to reflect on the extent and nature of his progress [at Viewpoint]," expressed optimism that he

would be able to continue his "positive momentum" in his next treatment setting, and "expressed his thanks/gratitude to staff and was very warm in saying his goodbyes to both staff and peers." (Id.)  He also "was able to spend some time before his discharge visiting with his parents off campus and reportedly managed himself well."  (Id.)  Colin was discharged from ViewPoint on September 25, 2018. (Docket entry no. 56 ¶ 48; docket entry no. 70 ¶ 48.)

Immediately after his discharge from ViewPoint, on September 26, 2018, Colin was enrolled at the Heritage Center ("Heritage"), a long-term residential treatment center that is also located in Utah.  (Docket entry no. 70 ¶ 48.)  Entry into the Heritage program marked Colin's first time attending a full-time, long-term residential treatment center.  (Docket entry no. 72-8, at 63.)  Defendants approved Plan benefits for Colin's initial treatment at Heritage, covering his stay from September 26–28, 2018.  (Docket entry no. 56 ¶ 54.)

At the time of his admission to Heritage, Colin's diagnoses included ADHD, major depressive disorder, oppositional defiant disorder, and intermittent explosive disorder. (Docket entry no. 56 ¶ 52; docket entry no. 69 ¶ 27.)  A medical and psychiatric evaluation conducted by Heritage staff on September 28, 2018, noted that Colin presented as "alert, oriented, well-groomed, pleasant and cooperative," that his "[m]ood and affect are neutral," that his "[t]hought process is appropriate," and that his "[j]udgment and insight are fair."  (Docket entry no. 72-8, at 64.)  It noted that Colin reported no anxiety or depression, no suicidal or homicidal thoughts, and that he understood that he was placed at Heritage due to problems with his "anger."  (Id. at 63.)  On September 28, 2018, the Home Director at Heritage reported that Colin "did well at school" that day, enjoyed going swimming in the group activity, and that he was "getting to know staff and his peers better."  (Docket entry no. 72-8, at 43.)  During his group therapy session on September 28, 2018, his therapist noted that "Colin did well working in

the group." (Id. at 42.)  During his individual therapy session on September 28, 2018, his therapist noted that Colin "did well working the session," that he was "very open and willing to discuss things," and that he was able to effectively "talk about the things that brought him here." (Id. at 38.)  Colin ultimately remained at Heritage for some time, through December 2019. (Docket entry no. 82 at 9.)  Plaintiffs' claims in this action focus principally on Defendants' denial of claims for coverage of Colin's stay at Heritage after September 28, 2018.

On October 10, 2018, a UBH Medical Director (Dr. Kathy Scott-Gurrell) had a call with one of Colin's treatment providers (Peter Brickey, Clinical Mental Health Counselor) at Heritage to discuss Colin's status.  (Docket entry no. 72-1, at 349–355, 385; docket entry no. 69 ¶ 32.)  In notes prepared by Dr. Scott-Gurrell after the call, she stated that Mr. Brickey reported that, since being admitted to Heritage, Colin had "agitation, anxiety, and anger – he has stabilized but [has] trouble with sleep."  (Docket entry no 72-1, at 351.)  He reported that, on October 7, 2018, after Colin had a negative "interaction with a peer," he began "punching the wall and kicking the bed" and "was told that he would have to be removed," but he "did calm down without need for issues"—in general, Mr. Brickey reported that Colin "does have [negative] verbal interactions with his peers but he does calm down with the staff interactions." (Id.)  Mr. Brickey noted that Colin had been visiting the physician once a month, that his medications remained stable, that his "parents are supportive," and that his weekly family sessions "are going well."  (Id.)  He stated that, overall, Colin "is doing better and responding to staff and using his coping skills."  (Id.)

Based on this report, Dr. Scott-Gurrell determined that coverage for Colin's further residential treatment should be denied as "the requested service does not meet the Level of Care Guideline required to be followed in [Colin's] behavioral health plan benefits."  (Id.)

Defendants advised Plaintiffs of the denial in a letter dated October 11, 2018, explaining as

follows:

> Based on the Optum Level of Care Guideline for the Mental
> Health Residential Treatment Center Level of Care, it is my
> determination that no further authorization can be provided from
> 09/29/2018. Your child admitted to a Mental Health Residential
> setting. After talking with your provider, it is noted your child has
> made progress and that your child's condition no longer meets
> Guidelines for further coverage of treatment in this setting. Your
> child is no longer aggressive. He does have a challenge with poor
> impulse control, but this does not require 24-hour monitoring.
> Your child is stable on medications and is not requiring weekly
> medical interventions. Your child has supportive parents. He does
> not require 24-hour monitoring as per his presentation. Your child
> should continue care in the Mental Health Partial Hospitalization
> Program setting.

(Docket entry no. 72-2, at 93–94.)

On April 2, 2019, Plaintiffs submitted a first-level appeal of UBH's initial

coverage determination.  (Docket entry no. 69 ¶ 37; docket entry no. 72-2, at 53.)  Included with

Plaintiffs' appeal were medical records from Heritage (such as psychiatric progress notes,

individual therapy notes, and notes from his academic advisor), which spanned the dates from his

admission at Heritage (September 26, 2018) through March 26, 2019, and which contained

detailed notes about Colin's daily condition.  (Docket entry no. 72-2 at 74; docket entry no. 72-6

at 62).  For example, the March 1, 2019, psychiatric progress note stated that Colin's "sleep has

been improving," that his "medications are stable," and that he "[s]eems to be able to control his

temper and [is] feeling positive."  (Docket entry no. 72-6, at 103.)  An individual therapy

progress note from March 7, 2019, states that Colin "has been doing well working with his peers

and also with his staff," and that "[o]verall we have been seeing him make progress and this has

been something he has felt good about and also his parents have felt good about."  (Id. at 98.)

The records also indicate that, during this time frame, Colin successfully participated in several

off-campus activities (such as rock climbing and snowboarding), and that he had several off-campus visits to stay with his parents (from November 20 to November 23, 2018; December 19 to December 28, 2018; and March 29 to April 2, 2019).  (Docket entry no. 69 ¶ 46; docket entry no. 78 ¶ 46.)

    Plaintiffs' first-level appeal was reviewed by a UBH Medical Director, Dr. Michael Soto, as well as by Dr. Sonya Jones, another UBH medical professional.  (Docket entry no. 69 ¶ 48; docket entry no. 72-1, at 367–68.)  Dr. Jones summed up her review of Colin's medical records by stating that, "during the appealed dates, [Colin] actively participated in therapy" and in "recreational activities as well as school," he "supported his peers," was "reminded to be mindful of boundaries," and his "mood was mostly euthymic."  (Docket entry no. 72-1, at 367–68.)  Dr. Soto similarly noted that Colin's medical records indicated that, during the appealed dates, Colin "made good progress" overall, he was "dedicated to making improvements in his social skills, behaviors, [and] controlling his mood and anger," he was "participating fully in groups and activities," he was "noted [by his treatment provider at ViewPoint] to be a 'positive peer'" and was "implementing new coping skills," he "had no ongoing medical complaints" and "was having successful passes with family," and he "was not a safety risk"—with such "notable improvement in his behaviors it is not clear why he needed continued [residential treatment]."  (Id. at 368–69.)  Dr. Soto also conducted a call with Colin's primary therapist at Heritage, who noted that, although Colin "did punch walls occasionally when [he] first started at [Heritage]," he "has not been physically aggressive with peers or staff," there were "no medical complaints" or "current safety concerns," there was "no evidence of psychosis or mania," and that Colin was "no longer meeting [the] criteria for intermittent explosive and oppositional defiant disorders."  (Id. at 369–70.)

In a letter dated May 15, 2019, UBH affirmed its decision to end coverage on September 29, 2018.  (Docket entry no. 72-9, at 70–71.)  The letter explained that, under the Optum Guidelines, the criteria to justify residential mental health treatment were not met because Colin (1) "had better control over his behavior," (2) he "was learning to use his new skills to express his emotions," (3) he was "described as a 'positive peer,'" (4) he was "reaching out to staff to work through his frustrations rather than acting out physically," (5) he was "taking his medicine and tolerating [it] well," (6) he was "engaged in therapies and activities," and (7) he had "no ongoing medical complaints."  (Id.)  The letter concluded that "it does not appear that [Colin] continued to need the 24 hour structure and medical support/intervention of a residential setting."  (Id. at 71.)

On July 10, 2019, Plaintiffs submitted a second-level appeal of the coverage determination.  (Docket entry no. 69 ¶ 55.)  Plaintiffs' second-level appeal was reviewed by another UBH Medical Director, Dr. Sabah Chammas.  (Docket entry no. 69 ¶ 56.)  After reviewing Colin's medical records (for the period within the appealed dates), Dr. Chammas noted that Colin had "engaged in limited altercations before," that he had "punched a door when upset," that he had a "history of making verbal threats" and had "threatened . . . suicide in the past just to gain control of situations," but that he had "no history of suicide attempts."  (Docket entry no. 72-1, at 373.)  He noted that, as of September 8, 2018, Colin had "improved overall," he was "not violent and did not attempt to harm himself on purpose," that his "history suggests longstanding conduct and behavioral issues that usually occur when [he] does not get his way," and that these issues were "amenable to treatment at a lower level of care."  (Id.)

In a letter dated July 17, 2019, Defendants affirmed the denial of coverage as of September 29, 2018.  (Docket entry no. 72-9, at 26–28.)   The letter explained that, under the

Optum Guidelines, the criteria to justify residential mental health treatment were not met

because: "[1] Your son was not hurting himself or others[;] [2] Your son was doing better[;] [3]

Your son was not having medical problems that need this level of care[;] [4] Your son could

improve his behavior at a lower level of care[;] [5] Your son was working with his provider in

order to get better[;] [and] [6] It does not seem that this setting could have helped him further."

(Id. at 27.)  The letter further explained that this determination "does not mean that your child

does not require additional health care, or that your child needs to be discharged[,]" but that "his

care and recovery could continue" in a lower intensity setting (such as a "Mental Health Partial

Hospital Program" or an "Intensive Outpatient Program").  (Id.)

On April 15, 2020, Plaintiffs requested an independent external review of UBH's

final coverage determination.  (Docket entry no. 69 ¶ 62.)  In support of their appeal, Plaintiffs

submitted Colin's medical records from ViewPoint and Heritage, as well as letters from several

of Colin's prior treatment providers who were not associated with ViewPoint or Heritage

(including pediatrician Dr. Sharon Held, psychiatrist Dr. Thomas O'Reilly, and therapist Licia

Delvivo).  (Docket entry no. 72-10, at 21.)  The letter from Dr. Held (dated January 15, 2019)

stated that Colin's residential treatment was medically necessary because Colin had made

"remarkable progress" during his time at Heritage, where he had been sent only "after exhausting

all out-[]patient treatments and counseling in this area with no appreciable success."  (Docket

entry no. 72-8, at 99–100.)  As examples of prior unsuccessful treatment regimens, Dr. Held

discussed various prescriptions for medication, counseling and psychiatric evaluation, intense

out-patient counseling, and multiple medication trials—in spite of which Colin "continued to be

disruptive in class, inattentive[], and not responsive to appropriate discipline techniques at

home," and "his poor impulse control and behavior concerns became dangerous to [Colin] and

his family's well[-]being" as he aged.  (Id. at 99.)  The letter from Dr. O'Reilly (dated January

11, 2019) stated that Colin's residential treatment was medically necessary because he has a

"history of significantly explosive and aggressive behaviors," he "previously made threats to

peers via social media," and he "failed multiple medication trials."  (Id. at 102.)  The letter

concluded that Dr. O'Reilly would have "great concerns were [Colin] to be discharged early"

and that Colin "requires long-term residential treatment."  (Id.)  The letter from Ms. Delvivo

(dated February 4, 2019) stated that Colin "has a history of significantly explosive and

aggressive behaviors" and "required several assessments . . . to determine if he [was] a danger to

himself or others," that he "failed multiple medication trials and during his last medication trial

he pulled all his braces off his teeth with pliers," and concluded that "[s]hort-term psychiatric

treatment has not benefited him . . . [Colin] requires long-term residential treatment."  (Id. at

104.)

Plaintiffs' external review was referred to an independent third-party

organization, Medical Review Institute of America, LLC, and was assigned to an independent

physician reviewer who was board certified in both child and adolescent psychiatry.  (Docket

entry no. 78 ¶ 63.)  In a report dated June 1, 2020, the external reviewer upheld UBH's final

coverage determination, denying coverage for the time frame of September 28, 2018, to

December 21, 2019.  (Docket entry no. 57-61.)  The report noted that the record "did not indicate

ongoing acute safety concerns that would have necessitated 24 hours a day 7 days a week mental

health treatment" at Heritage after September 28, 2018.  (Id. at 7.)  It noted that, in early 2018,

prior to Colin's inpatient admission, he had successfully maintained part-time work outside the

home in a pizza restaurant, and that he had passed his school year (though his grades were lower

than usual).  (Id.)  It noted that, during the report timeframe, there was "no documented

persistent suicidal or homicidal ideation," "no psychotic symptoms," and "aside from punching a wall on 12/17/18 without injury," Colin did not "engage in any significant self-injurious behaviors." (Id.) The report noted that Colin was permitted to attend activities outside of the Heritage facility (such as outdoor rock climbing), that he was "medically stable and tolerated [his] medications" and that, during his time at Heritage, he did well overall in therapy and in his classes. (Id.) As a result, the report concluded, Colin's treatment "did not require the intensity of residential mental health services," but treatment should be continued "in a less restrictive setting." (Id.)

Following the denial of the final external appeal, Plaintiffs initiated this action in October 2020 challenging the denial of benefits. (See docket entry no. 1; docket entry no. 30.) Plaintiffs have moved for summary judgment as to the denial-of-benefits claim under ERISA (the Fifth Cause of Action), and the claims under the Parity Act (the First and Fourth Causes of Action) (docket entry no. 51), and Defendants have cross-moved for summary judgment as to these claims (docket entry no. 63).

<u>DISCUSSION</u>

The parties each move for summary judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedure. Summary judgment is warranted when the movant shows that there is no genuine dispute as to any material fact, and that the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Material facts are those that "might affect the outcome of the suit under the governing law," and there is a genuine dispute where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98,

104 (2d Cir. 2011) (internal quotation marks and citation omitted).  The moving party bears the

burden of demonstrating the absence of a material fact, and the court must be able to find that,

"'after drawing all reasonable inferences in favor of a non-movant, no reasonable trier of fact

could find in favor of that party.'"  Marvel Entm't, Inc. v. Kellytoy (USA), Inc., 769 F. Supp. 2d

520, 523 (S.D.N.Y. 2011) (quoting Heublein v. United States, 996 F.2d 1455, 1461 (2d Cir.

1993)).

        "Assessments of credibility and choices between conflicting versions of the

events are matters for the jury, not for the court on summary judgment."  Jeffreys v. City of New

York, 426 F.3d 549, 553-54 (2d Cir. 2005) (citations omitted).  "However, '[t]he mere existence

of a scintilla of evidence in support of the [the movant's] position will be insufficient; there must

be evidence on which the jury could reasonably find for the [the movant].'"  Id. at 554 (emphasis

in original) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).  Where, as

here, there are cross-motions for summary judgment, the court will "assess each motion on its

own merits and . . . view the evidence in the light most favorable to the party opposing the

motion, drawing all reasonable inferences in favor of that party."  Bey v. City of New York, 999

F.3d 157, 164 (2d Cir. 2021) (citation omitted).

        This case presents two primary legal issues: whether Defendants properly denied

Plaintiffs' claim for residential treatment benefits (under ERISA) for the period beginning on

September 29, 2018; and whether the terms of the Plan violated the Parity Act.  For the reasons

explained below, the Court concludes that Defendants are entitled as a matter of law to judgment

in their favor as to the alleged Parity Act violations (as asserted in the First and Fourth Causes of

Action), but neither party is entitled to summary judgment as to the benefit-denial claim under

ERISA (as asserted in the Fifth Cause of Action).

Claim for Recovery of Benefits under ERISA

Under Section 1132 of ERISA, an employee benefit plan participant or beneficiary may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C.A. § 1132(a)(1)(B) (WestLaw through P.L. 118-13).  The parties here do not dispute that the Plan was governed by ERISA, or that Plaintiffs were Plan participants or beneficiaries.  Plaintiffs argue that Defendants improperly denied their claim for Colin's continued inpatient residential treatment at Heritage.

Standard of Review

The parties disagree as to the proper standard of review.  Defendants assert that the Court should analyze the denial of benefits under an abuse of discretion standard, while Plaintiffs maintain that the Court should undertake a de novo review.  "When a plaintiff asserts a claim for benefits due, [federal courts] review the plan administrator's decision de novo unless the benefit plan gives the administrator . . . discretionary authority to determine eligibility for benefits or to construe the terms of the plan, in which case an arbitrary and capricious standard applies." In re DeRogatis, 904 F.3d 174, 187 (2d Cir. 2018) (internal quotation marks and citation omitted); see also Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).

"The plan administrator bears the burden of proving that the deferential [abuse of discretion] standard of review applies." Fay v. Oxford Health Plan, 287 F.3d 96, 104 (2d Cir. 2002) (citation omitted).  Thus, if the plan administrator establishes that it had discretion, the court will review the benefit denial under the arbitrary and capricious standard, but, if the plan

administrator cannot demonstrate that it had discretion, the court will review the benefit denial

de novo.  Here, both parties recognize that the Plan expressly grants Defendants discretion in

approving and administering claims.  (See Pls. Mem. at 3; Defs. Mem. at 5.)   Specifically, the

Plan provides that UBH has "discretionary authority to make any findings necessary or

appropriate for any purpose under the Plan, including to interpret the terms of the Plans and to

determine eligibility for and entitlement to benefits under the Plans." (UBH 199.)  Thus, the

Court would ordinarily apply the abuse of discretion standard in evaluating Plaintiffs' claim for

Plan benefits.

       Plaintiffs, however, invoke an exception to this rule, asserting that the abuse of

discretion standard does not apply because Defendants violated various provisions of

Department of Labor regulations concerning the processing of benefit claims under ERISA-

governed plans.  "Even when [a] plan confers . . . discretion, [courts] review de novo those cases

in which a plan 'fail[s] to comply with the Department of Labor's claims-procedure

regulation[s],' unless that failure 'was inadvertent and harmless' with regard to the claim at

issue." In re DeRogatis, 904 F.3d at 187 (quoting Halo, 819 F.3d at 58); see also Halo, 819 F.3d

at 45 (emphasis in original) ("Specifically, we hold that, when denying a claim for benefits, a

plan's failure to comply with the Department of Labor's claims-procedure regulation, 29 C.F.R.

section 2560.503-1, will result in that claim being reviewed de novo in federal court, unless the

plan has otherwise established procedures in full conformity with the regulation and can show

that its failure to comply with the regulation in the processing of a particular claim was

inadvertent and harmless.").  Defendants argue that no such violations occurred.

       "[D]istrict courts . . . agree that a plaintiff must make the initial showing that a

plan violated the DOL's regulations before shifting any burden onto the plan administrator."

Hinchey v. First Unum Life Ins. Co., No. 17-CV-08034-NSR, 2020 WL 1331898, at \*16 (S.D.N.Y. Mar. 20, 2020) (citations omitted), aff'd, 848 F. App'x 481 (2d Cir. 2021); see also Donlick v. Standard Ins. Co., No. 3:16-CV-617, 2017 WL 1683060, at \*3 n.1 (N.D.N.Y. May 2, 2017) (citation omitted) (stating that a plan administrator's "burden to prove compliance with DOL regulations arises, if it ever arises, only after a plaintiff makes a reasonable showing that the defendant violated DOL rules"); see also Capretta v. Prudential Ins. Co. of Am., No. 16-CV-1929-DAB, 2017 WL 4012058, at \*6 (S.D.N.Y. Aug. 28, 2017) (emphasis in original) ("Requiring a plan to prove affirmatively compliance [with DOL regulations] based on the mere allegation that it might have violated the regulations would spawn endless litigation prior to reaching the merits in ERISA cases[.]")

Plaintiffs contend that Defendants violated the claim procedure regulations in three respects: (1) failing to take all evidence into account (in violation of 29 C.F.R. section 2560.503-1(h)(2)(iv)); (2) failing to meet minimum notice standards (in violation of 29 C.F.R. section 2560.503-1(g)); and (3) failing to apply Plan provisions consistently with respect to similarly situated claimants (in violation of 29 C.F.R. section 2560.503-1(b)(5)).  (Pls. Mem. at 14.)  The Court concludes that Plaintiffs have met their burden of showing that Defendants violated the minimum notice standards contained in the DOL regulations.

Section 2560.503-1(g) of the regulations provides that a plan administrator must give all claimants written notice of any adverse benefit determination, and that such notice must "set forth, in a manner calculated to be understood by the claimant," the following information:

> (i) The specific reasons for the adverse determination;
> (ii) Reference to the specific plan provisions on which the determination is based; [and]
> (iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material

or information is necessary . . . .

29 C.F.R. § 2560.503-1(g)(i)–(iii).

Plaintiffs contend that these provisions have not been satisfied because the denial letters issued by Defendants never explained which specific Plan provisions or Optum Guidelines criteria they applied in making their benefits determination, and never specifically discussed the key Plan concept of medical necessity.

Courts in this Circuit have routinely concluded that a claim administrator violates Section 2560.503-1(g)(ii) when the claim denial letter fails to explain what specific plan provisions the administrator relied upon in reaching its decision.  See, e.g., McCutcheon v. Colgate-Palmolive Co., No. 16-CIV-4170-LGS, 2020 WL 3893303, at *8 (S.D.N.Y. July 10, 2020) (concluding that defendant violated Section 2560.503-1(g) where the claim denial letter "provides no reference to the specific Plan provisions . . . upon which denial was based"); Montefiore Med. Ctr. v. Loc. 272 Welfare Fund, No. 09-CV-30960-RA-SN, 2019 WL 571455, at *3 (S.D.N.Y. Jan. 25, 2019) (concluding that defendant violated Section 2560.503-1(g) where "[n]one of the Explanation of Benefits forms [provided to plaintiff] references a specific Plan provision"), report and recommendation adopted, No. 09-CV-3096-RA-SN, 2019 WL 569805 (S.D.N.Y. Feb. 12, 2019); Babino v. Gesualdi, 278 F. Supp. 3d 562, 584 (E.D.N.Y. 2017) (concluding that defendant violated Section 2560.503-1(g) because the denial of benefits letter "failed to reference the specific plan provisions on which [defendants] relied" in calculating the plaintiff's pension benefits), aff'd, 744 F. App'x 30 (2d Cir. 2018); Scarangella v. Grp. Health Inc., No. 05CIV5298 (RJS), 2009 WL 764454, at *11 (S.D.N.Y. Mar. 24, 2009) (concluding that defendant violated Section 2560.503-1(g) where the "explanations in the [explanation of benefits forms provided to plaintiff] do not reference any provisions of the [plan]" and thus "do not

comply with this aspect of the DOL regulations"); Infantolino v. Joint Indus. Bd. of the Elec. Indus., No. 06-CV-00520-JG, 2007 WL 879415, at *5 (E.D.N.Y. Mar. 15, 2007) (concluding that defendant violated Section 2560.503-1(g) where the denial letter sent to plaintiff "did not refer to specific Plan provisions upon which the denial was based"); Med. Soc'y of New York v. UnitedHealth Grp. Inc., No. 16-CV-5265-JPO, 2017 WL 4023350, at *4 (S.D.N.Y. Sept. 11, 2017) (concluding that plaintiff had adequately alleged violation of Section 2560.503-1(g) where the defendant's "denial notifications to [plaintiffs] failed to identify the specific terms of the underlying health plans that supported the adverse determinations").

Here, the first three claim denial letters that Defendants provided to Plaintiffs failed to reference the specific Plan provision the upon which the denial was based. The first denial letter stated that the determination was based upon "the Optum Level of Care Guideline for the Mental Health Residential Treatment Center Level of Care" (docket entry no. 72-2, at 93–94); the second letter also stated that the determination was based upon "the Optum Level of Care Guideline for the Mental Health Residential Treatment Center Level of Care" (docket entry no. 72-9, at 70–71); and the third letter stated that the determination was based upon "the Optum Level of Care Guideline, Mental Health Residential Treatment Level of Care" (id. at 26–28). The final denial letter prepared by the external reviewer provided more detail—stating that coverage was unavailable because "the patient does not meet the Optum United Behavioral Health Level of Care Guidelines Number: BH803LOCG052018 criteria for coverage of residential treatment for dates of service 09/28/18 – 12/21/19," and that "there are no clinical circumstances unique to this particular patient that would make residential treatment medically necessary based on the plan definition and current medical literature." (Docket entry no 57-61, at 3.) This final letter also recited the Plan's medical necessity requirement (noting that it could

be found "on page 61" of the Plan); and recited the Plan's definition of "Medically Necessary" (noting that it could be found "on page 203" of the Plan).  (Id. at 7–8.)

The Court concludes that Plaintiffs have established a violation of Section 2560.503-1(g)(ii), because the first three denial of benefits letters improperly failed to reference the specific plan provisions on which the determination is based.  Although each letter conveyed a determination that the residential treatment was found unnecessary and that a lower level of treatment would be appropriate, none of the first three letters referenced any specific provision of the Plan, or specifically mentioned the key concept of medical necessity—they simply cited and provided internet URL information for the Optum Guidelines.

The Court further concludes that Defendants have not established, and do not even argue, that this regulatory violation was inadvertent or harmless.  Instead, Defendants simply state that the denial letters contained an explanation as to why treatment at Heritage was denied as unnecessary (see docket entry no. 82, at 14)—but Defendants do not explain why the letters fail to mention the concept of medical necessity, or why the letters failed to reference the specific provision of the _Plan_ (not the Optum Guidelines) upon which the reviewers relied. Defendants further argue that the content of Plaintiffs' appeal letters demonstrates that Plaintiffs "fully understood that benefits were denied due to lack of Medical Necessity."  (Id.)  But that is not the relevant inquiry.  Courts have held that a denial letter's improper failure to recite plan provisions (in violation of Section 2560.503-1(g)) cannot be cured by a defendants' assertion that the plaintiff was clearly "on notice" of the plan provisions, because the ERISA regulations "do not merely require that Plaintiff be broadly aware of the rule underlying the denial of [the relevant] claim"—"[i]nstead, [the regulations] require that Plaintiff be made aware of the specific reasons for the Plan's determination and be provided with references to the specific Plan

provisions on which the determination is based." Guzman v. Bldg. Serv. 32BJ Pension Fund, No. 22-CV-01916-LJL, 2023 WL 2526093, at *12 (S.D.N.Y. Mar. 15, 2023) (internal quotations marks and citations omitted).  The fact that a plaintiff "could have reviewed the Plan and come to the conclusion" that a certain plan provision "was the reason for the denial of [the relevant] claim is plainly insufficient."  Id.

Moreover, the fact that the final denial letter prepared by the external reviewer did discuss the Plan's medical necessity provision (and did provide a citation to the Plan page number where it could be found), does not cure the deficiencies of the prior three letters.  In the context of showing compliance with ERISA regulations post-Halo, courts have concluded that an omission in an initial denial of benefits letter cannot be cured by a later, more-thorough letter. For example, in Cohen v. Liberty Mut. Grp. Inc., 380 F. Supp. 3d 363 (S.D.N.Y. 2019), the court concluded that an adverse benefit determination letter that the plaintiff had received from his insurer violated the regulations because it "provided only vague reasons for the denial" and it "did not identify any provision of the [plan] under which the benefits were terminated."  Id. at 379.  The defendant argued that any omission in the initial denial letter was harmless, because the defendant eventually sent plaintiff a subsequent letter with a fuller explanation of the denial, and because plaintiff was still able to access to terms of the plan himself.  Id.  The court concluded that "[d]efendants' failure to provide" the information required by the regulations "until almost five months later in the [subsequent] letter" was "not similar to the scenarios envisioned by the Halo court, such as responding one hour or one day late, where such delays do not harm the claimant in a material way."  Id.  (citing Halo v. Yale Health Plan, Dir. of Benefits & Recs. Yale Univ., 819 F.3d 42, 57 (2d Cir. 2016)).  The court thus held that it was "justified in reviewing the adverse benefits determination de novo."  Cohen, 380 F. Supp. at 379.   Here, the

Court likewise concludes that Defendants' failure to reference any specific Plan provisions in

their initial October 2018 denial letter was not cured by their later discussion of these Plan

provisions in their final June 2020 denial letter—an improper omission from a benefits denial

letter, left unremedied for nearly two years, is not comparable to the types of trivial harmless

errors envisioned by the Halo court.

        Defendants have thus failed to demonstrate that this regulatory violation was

inadvertent and harmless.  See McCutcheon v. Colgate-Palmolive Co., No. 16-CIV-4170-LGS,

2020 WL 3893303, at *8 (S.D.N.Y. July 10, 2020) (emphasis in original) (citations omitted)

("[C]ontrary to Defendants' assertions that Plaintiffs have failed to identify prejudice, it is

Defendants' burden to show that a violation of the ERISA Procedures Regulations was

inadvertent and harmless.").  Accordingly, the Court finds that Defendants are not entitled to the

benefit of the arbitrary and capricious review standard; rather, Plaintiffs' denied claim is subject

to review de novo.


        De Novo Review of the Claim for Coverage of Residential Treatment in the
        Summary Judgment Context

        "[A]s a matter of general insurance law, the insured has the burden of proving that

a benefit is covered[.]"  Mario v. P & C Food Markets, Inc., 313 F.3d 758, 765 (2d Cir. 2002).

Here, all parties agree that Plaintiffs bear the burden of demonstrating entitlement to the disputed

benefit under the Plan, namely continuous residential treatment at Heritage from September 29,

2018, onwards.  Because the proper standard of review in this case is de novo, the Court affords

no deference to Defendants' decision as the plan administrator, see O'Hara v. Nat'l Union Fire

Ins. Co., 642 F.3d 110, 116 (2d Cir. 2011) (citations omitted), and limits its review to the

administrative record at the time of denial, absent good cause.  See Halo, 819 F.3d at 60 (citing

DeFelice v. Am. Int'l Life Assurance Co., 112 F.3d 61, 66-67 (2d Cir. 1997)).  Furthermore, the

"de novo standard of review applies to all aspects of the denial of an ERISA claim, including fact

issues[.]"  Kinstler v. First Reliance Standard Life Ins. Co., 181 F.3d 243, 245 (2d Cir. 1999).

"Although there is no right to a jury trial in a suit brought to recover ERISA

benefits . . . and thus the district court would [be] the factfinder at trial, the district court's task

on a summary judgment motion," even in a de novo review posture, "is to determine whether

genuine issues of material fact exist for trial, not to make findings of fact."  O'Hara, 642 F.3d at

116.  An exception exists where the parties move for "judgment on the administrative record," a

motion that, although not contemplated in the Federal Rules of Civil Procedure, enables the

district court to treat the motion as a "summary trial" or "bench trial on the papers" and act as

finder of fact.  See O'Hara, 642 F.3d at 116 (citing Muller v. First Unum Life Ins. Co., 341 F.3d

119, 124 (2d Cir. 2003)).  However, to proceed in this fashion, "it must be clear that the parties

consent" to such a "summary trial" or "bench trial on the papers."  O'Hara, 642 F.3d at 116

(citing Burke v. PriceWaterHouseCoopers LLP, Long Term Disability Plan, 537 F. Supp. 2d

546, 548 (S.D.N.Y. 2008) (noting parties consented to "summary trial" on stipulated

administrative record, waiving right to call witnesses)).  Because the parties have not moved for

or consented to this alternative type of proceeding, the Court must proceed in a traditional

summary judgment posture, "limit[ing] its inquiry to determining whether questions of fact exist

for trial."  See O'Hara, 642 F.3d at 116.

Under the Plan, treatment is only covered if it is "Medically Necessary."  (UBH at

36.)  Medical necessity is evaluated based on principles of "clinical evidence," "clinical

effectiveness," "clinical appropriateness," and "cost effectiveness."  (Id.)  The Plan also provides

a more specific definition of "Medically Necessary" as:

> Those covered services that are determined by the Health Plan
> Administrator (in its sole discretion) to be: [1] Provided for the diagnosis,
> treatment, cure, or relief of a health condition, illness, injury, or disease[;]
> [2] Not for experimental, investigational, or cosmetic purposes[;] [3]
> Necessary for and appropriate to the diagnosis, treatment, cure or relief of
> a health condition, illness, injury, disease or its symptoms[;] [4] Within
> generally accepted standards of medical care in the community[;] [and] [5]
> Not solely for the convenience of the employee, the employee's family, or
> the provider[.]

(UBH at 203.)

For claims involving mental health or substance abuse services, the Plan

authorizes claims administrators to rely on certain outside guidelines to evaluate whether the

services are medically necessary.  (See UBH at 58 (noting that coverage may be denied when the

plan administrator determines, "in [its] reasonable judgment," that the services are "[n]ot

consistent with the Plan Administrator's or its mental health/substance abuse vendor's guidelines

or best practices as modified from time to time").)  In the present case, Defendants relied on a set

of guidelines promulgated by UBH, denominated the Optum Level of Care Guidelines (the

"Optum Guidelines"), to evaluate Colin's claim for coverage of residential mental health

services.  (See UBH at 210.)  Under the Optum Guidelines, treatment at any particular type of

mental health facility is justified when, inter alia, "the member's current condition cannot be

safely, efficiently, and effectively assessed and/or treated in a less intensive level of care," the

services are "medically necessary," and the services are "for the purpose of diagnostic study or

reasonably . . . expected to improve the patient's condition."  (UBH at 211.)  The Optum

Guidelines label the complete list of criteria for admission, continuing stay, and discharge from

any given type of facility as the "Common Criteria." (See id. at 211–212.)

In Colin's case, the facility to which he was admitted (Heritage) was classified

under the Optum Guidelines as a Residential Treatment Center ("RTC").  (Docket entry no. 70 ¶

51.)  An RTC is described in the Optum Guidelines as "[a] facility-based program which delivers 24-hour/7-day assessment and diagnostic services, and active and behavioral health treatment" to patients who "do not require the intensity of nursing care, medical monitoring and physician availability" offered in full inpatient settings.  (UBH at 223.)  RTC treatment is "focused on addressing the member's condition to the point that the member's condition can be safely, efficiently and effectively treated in a less intensive level of care . . . ."  (Id.)  The Optum Guidelines state that admission to an RTC is justified when the Common Criteria are met, and when:

> [s]afe, efficient, effective assessment and/or treatment of the member's condition requires the structure of a 24-hour/seven days per week treatment setting. Examples include the following: Impairment of behavior or cognition that interferes with activities of daily living to the extent that the welfare of the member or others is endangered . . . [and] [p]sychosocial and environmental problems that are likely to threaten the member's safety or undermine engagement in a less intensive level of care without the intensity of services offered in [an RTC].

(UBH at 223–24.)

Under the Optum Guidelines, a continuing stay at an RTC is justified when the Common Criteria are met, and "[t]reatment is not primarily for the purpose of providing custodial care."  (Id. at 224.)  Services are "custodial" when they are, inter alia, "[n]on-health related, such as assistance in the activities of daily living," or when they "do not require continued administration by trained medical personnel."  (Id.)

The parties have proffered letters from various medical professionals that present conflicting opinions and thus frame genuine issues of material fact as to whether continued treatment in a residential facility after September 28, 2018, was necessary given Colin's condition, pursuant to either the Plan's definition of "Medically Necessary," or the expanded guidance for when a continuing stay at an RTC is justified, as set forth in the Guidelines.

For example, Plaintiffs cite to a June 16, 2019, letter from Colin's medical providers at Heritage, who asserted that "Colin requires 24 hours 7 days week care in order to keep himself and others safe," referencing the criteria for admittance and continuing stay in the Optum Guidelines.  (See docket entry no. 55, at 4–5; UBH at 1957–58).  The providers also noted that, "while Colin has shown progress and a decrease in frequency and intensity of violent outbursts, he has not been able to demonstrate capacity to manage his symptoms with a lower level of care," and further disputed that "there are no safety concerns" associated with a step down in care.  (See UBH at 1957–59.)  The letter was submitted in support of Plaintiffs' adverse benefits determination appeal and signed by Russel MacKay, LCMHC, NCC, SSW, Eugene Marshall, LCSW, and Jamis Leeper, DNP, APRN, PMHNP-BC.  (See docket entry no. 72-10, at 21; UBH at 1959).  Mr. MacKay also compiled excerpts from his shift reports for Colin over a month-long period to demonstrate Colin's difficulty regulating his behavior as further support for Colin's continued need for treatment, which he asserted met the Guidelines criteria for continuing stay.  (See UBH at 1961–63).

These letters were supplemented with letters from three of Colin's outside treatment providers who asserted that continued residential treatment at Heritage was medically necessary, although two of the providers had not seen Colin since his admission at Heritage. (See docket entry no. 72-10, at 21; UBH at 1468–69 (letter dated January 15, 2019, from Dr. Sharon L. Held, DO, discussing the failure of prior, less intensive treatments and past concerns about dangerous behavior on Colin's part); id. at 1471 (January 11, 2019, letter from Dr. Thomas C. O'Reilly, MD, referencing Colin's history of "significantly explosive and aggressive behaviors" and prior failed medication trials); id. at 1473 (letter dated February 4, 2019, from Licia A. DeVivo, MSS, LCSW, discussing Colin's diagnoses, his history of aggressive and

dangerous behavior, and the failure of prior medication trials and short-term psychiatric treatment).

        In contrast, Defendants cite evaluations conducted by a number of UBH physicians who, relying on the clinical information and the Guidelines, found that Colin's condition was sufficiently improved such that treatment at an RTC was no longer necessary after September 28, 2018.  (See docket entry no. 68, at 7–15; docket entry no. 69 ¶¶ 32, 48, 56, and 63 (noting that the UBH reviews were conducted by Dr. Kathy Scott-Gurnell, who was board certified in child and adolescent psychiatry; Dr. Michael Soto, who was board certified in psychiatry and neurology; Dr. Sabah Chammas, who was board certified in general psychiatry; and the independent external reviewer physician, who was board certified in child and adolescent psychiatry)).  These evaluations paint a somewhat different picture of Colin's mental health following his admission to Heritage.  For example, in conducting the first-level appeal of the adverse benefits determination, Dr. Soto reviewed Colin's medical records and spoke with Colin's primary therapist at Heritage, Russel MacKay, before coming to the conclusion that "it does not appear that your child continued to need the 24-hour structure and medical support/intervention of a residential setting" after September 28, 2018.  (UBH at 367–68.)  Dr. Soto spoke of a number of improvements in Colin's behavioral control, and noted that in his call with Colin's primary therapist, Mr. MacKay had reported that Colin was "no longer meeting criteria for intermittent explosive and oppositional defiant disorders" and presented "no current safety concerns."[6]  (See id. at 368.)  The initial review and determination by Dr. Scott-Gurnell,

---

[6]    The Court notes that a summary of this call was included in a record created by Dr. Soto on May 16, 2019.  (UBH at 368).  Mr. MacKay subsequently signed onto the June 16, 2019, letter by Heritage treatment providers who urged that Colin's 24/7 residential treatment at Heritage continued to be necessary and met the criteria for coverage under the Guideline, and submitted shift report excerpts in support of that finding on July 2,

second-level appeal conducted by Dr. Chammas, and the independent external reviewer

physician similarly spoke of Colin's improvements, stable condition, and apparent lack of

serious violence or presentation of threat.  (See id. at 348–50, 372–73, 1151–53, 1994–2000).

The independent reviewer concluded that no "compelling clinical rationale [] would justify

medical necessity for any additional residential care from 9/28/18-12/21/19 based on the

documentation provided," although each UBH physician and the independent reviewer suggested

that less restrictive treatment, such as admission to a "Mental Health Partial Hospitalization

Program," would be appropriate.  (Id. at 517, 1596, 1552, 1999).

          In short, Colin's treatment providers at Heritage, external treatment providers, and

the UBH physicians reached materially different conclusions as to Colin's condition and his need

for continued residential treatment.  While there appear to be some relevant distinctions in the

qualifications of these differing medical professionals—the Heritage treatment providers who

opined that Colin required continuing 24/7 care were counselors, social workers, and nurses (see

UBH at 1957–59), and two of his external treatment providers had not seen him since before his

admission to Heritage (see id. at 1471, 1473), while the UBH professionals who opined that

Colin could safely handle a step down in treatment were all board-certified physicians and had

reviewed Colin's medical records, spoken with his treatment providers at Heritage, and, during

the appeals process, reviewed Plaintiffs' submissions (see docket entry no. 69 ¶¶ 32, 48, 56, and

63)—these distinctions are not so significant as to amount to "incontrovertible evidence" that "so

utterly discredits" Plaintiffs' proffered evaluations that no reasonable factfinder could find in

favor of Plaintiffs' on the question of medical necessity.  See O'Hara, 642 F.3d at 121 (quoting

Cameron v. City of New York, 598 F.3d 50, 58 (2d Cir. 2010)) (finding district court had

_____

2019.  (See UBH 1957–63).

improperly granted summary judgment where, based on proffered medical evaluations, genuine dispute existed regarding the extent of plaintiff's disability following a head injury). Furthermore, there is no indication that any of the proffered medical opinions, whether by Plaintiffs or by Defendants, is unreliable as a matter of law.  See Napoli v. First Unum Life Ins. Co., 78 F. App'x 787, 789 (2d Cir. 2003) (finding, "[a]bsent any indication that [the opinion of plaintiff's treating cardiologist was] unreliable as a matter of law," two differing medical opinions as to Plaintiff's disability "presente[d] a genuine issue as to the material fact of [plaintiff's] medical condition").

Under either the Plan's medical necessity criteria, or the criteria articulated in the Optum Guidelines, the conflicting medical opinions therefore present a genuine dispute of material fact as to whether Colin's condition required full-time care at a residential treatment center after September 28, 2018, such that coverage was appropriate under the Plan.  For the Court to find, in this de novo posture, that Plaintiffs have met their burden to demonstrate their entitlement to coverage of Colin's continued treatment at Heritage, or, conversely, that Defendants had met their burden to sustain the adverse benefits decision, the Court would be required to determine what weight should be accorded to the various opinions of medical professionals proffered by the parties.  Such a determination is outside the scope of the Court's authority in a traditional summary judgment posture.  See, e.g., Jeffreys v. City of New York, 426 F.3d 549, 553–54 (2d Cir. 2005) (citation omitted) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."); Napoli, 78 F. App'x. at 789 (finding district court's assessment that two medical opinions presented "no substantial difference of opinion," and resolution of the case, which "depend[ed], in part, on credibility determinations," to be improper in summary judgment

posture).

In light of the material disputed factual issues concerning the necessity of the treatment for which coverage was denied, the Court finds that neither Plaintiffs nor Defendants are entitled to summary judgment with respect to Plaintiffs' claim for improper denial of benefits (the Fifth Cause of Action).

### Parity Act Claims

Plaintiffs next bring a set of claims under the Parity Act, alleging that certain portions of the Plan provide unequal treatment for mental health benefits.  The Parity Act, an amendment to ERISA, was intended to "end discrimination in the provision of insurance coverage for mental health and substance use disorders as compared to coverage for medical and surgical conditions in employer-sponsored group health plans."  Am. Psychiatric Ass'n v. Anthem Health Plans, Inc., 821 F.3d 352, 356 (2d Cir. 2016) (citation omitted).  It provides, in relevant part, that an ERISA group health plan which provides "both medical and surgical benefits and mental health" benefits must ensure that "the treatment limitations" and "financial requirements" applicable to such mental health benefits "are no more restrictive than the predominant [financial requirements/treatment limitations] applied to substantially all medical and surgical benefits covered by the plan," and that there are no separate "limitations that are applicable only with respect to mental health . . . disorder benefits."  29 U.S.C.A. § 1185a(a)(3)(A)(i)–(ii) (WestLaw through P.L. 118-13).

"Essentially, the Parity Act requires ERISA plans to treat sicknesses of the mind in the same way that they would a broken bone."  Munnelly v. Fordham Univ. Fac., 316 F. Supp. 3d 714, 727–28 (S.D.N.Y. 2018) (internal quotations and citation omitted).  The Parity Act "may

be enforced using the civil enforcement provisions in ERISA[.]"  Id. at 728.  As defined in the

Act, a "treatment limitation" may include "limits on the frequency of treatment, number of visits,

days of coverage, or other similar limits on the scope or duration of treatment," and a "financial

requirement" may include "deductibles, copayments, coinsurance, and out-of-pocket

expenses[.]"  29 U.S.C.A. § 1185a(a)(3)(B)(i)–(iii) (WestLaw through P.L. 118-13).

Treatment limitations include "both quantitative treatment limitations, which are

expressed numerically (such as 50 outpatient visits per year), and nonquantitative treatment

limitations, which otherwise limit the scope or duration of benefits for treatment under a plan or

coverage."  29 C.F.R. § 2590.712(a).  Nonquantitative treatment limitations on mental health

benefits include "[m]edical management standards limiting or excluding benefits based on

medical necessity or medical appropriateness" and "[r]efusal to pay for higher-cost therapies

until it can be shown that a lower-cost therapy is not effective (also known as fail-first policies or

step therapy protocols)."  Id. § 2590.712(c)(4)(ii).  The Parity Act regulations specify that all

"processes, strategies, evidentiary standards, or other factors used in applying" nonquantitative

treatment limitations are subject to the statute's parity requirements.  Id. §

2590.712(c)(4)(iii).  Treatment limitations "are not necessarily evident on the face of an

insured's plan terms," and sometimes "may be imposed during a claim administrator's

application of the plan to a given claim for benefits"—in other words, a Parity Act violation may

occur based not only on the plan's plain language, but also based on the plan's application.

David P. v. United Healthcare Ins. Co., No. 19-CV-00225-JNP-PMW, 2020 WL 607620, at *15

(D. Utah Feb. 7, 2020).

In order to prevail on a Parity Act claim, a plaintiff must: (1) show that the

insurance plan "is of the type covered by the Parity Act;" (2) show that the insurance plan

"provides both medical benefits and mental health benefits;" [7] (3) identify a specific type of medical/surgical treatment covered by the plan that is analogous to / "in the same classification as" the mental health treatment that the plaintiff seeks; and (4) demonstrate that the plan features a "treatment limitation" that is "more restrictive for mental health treatment than it is for [the analogous] medical treatment." Gallagher v. Empire HealthChoice Assurance, Inc., 339 F. Supp. 3d 248, 256 (S.D.N.Y. 2018) (citation omitted).

Plaintiffs argue that the Plan violated the Parity Act in two ways: (1) by providing reimbursement for travel and lodging expenses incurred for medical/surgical treatments, but not for mental health treatments; and (2) by evaluating mental health treatment claims using a set of outside guidelines (the Optum Guidelines), but failing to apply those same guidelines to medical/surgical treatment claims. (Docket entry no. 30, at 11–12, 14–15.)  The Court addresses each of these arguments in turn.

Parity Act – Travel and Lodging Expenses

Plaintiffs first take issue with the Plan's allegedly disparate treatment of reimbursement benefits for travel and lodging expenses.  The Plan provides for limited travel and lodging reimbursement for approved "cancer-related treatments, obesity surgery, eligible knee/hip/spine surgeries . . . or a transplant procedure," but does not explicitly provide such benefits for mental health treatments.  (UBH at 50.)  Plaintiffs argue that the Plan's failure to provide for travel and lodging reimbursement for any kind of mental health treatments, while providing such benefits for medical treatments like cancer treatments, constitutes a violation of

---

[7]    Here, is it undisputed that the first two elements are met—the Plan was covered by the Parity Act, and the Plan provides coverage for both medical/surgical benefits and mental health benefits.  (Docket entry no. 68, at 29.)

the Parity Act.  Plaintiffs state that they incurred over $10,000 in travel expenses in the course of

Colin's mental health treatment at Heritage, and allege that they would have been eligible for

reimbursement of these expenses if the Plan provided equal coverage.  (See docket entry no. 58.)

The Court concludes that Plaintiffs have failed to establish the third element of

their Parity Act claim, as they have not identified an analogous medical/surgical treatment that is

"in the same classification as" the mental health treatment they seek.  In evaluating this element,

the comparison relied upon by the plaintiff must be "between mental health/substance abuse and

mental health/surgical care [benefits]" that are "in the same classification."  David P., 2020 WL

607620, at *14 (citing 29 C.F.R. § 2590.712(c)(4)(i)).  The regulations promulgated pursuant to

the Act identify six classifications: (1) inpatient, in-network; (2) inpatient, out-of-network; (3)

outpatient, in-network; (4) outpatient, out-of-network; (5) emergency care; and (6) prescription

drugs. See 29 C.F.R. § 2590.712(c)(2)(ii)(A).  "Within each classification, group health plans are

required to provide the same treatment limitations for mental health and medical surgical

benefits[.]"  Munnelly, 316 F. Supp. 3d at 729 (citing 29 C.F.R. § 2590.712(c)(2)(i)); see also

Bushell v. UnitedHealth Grp. Inc., No. 17-CV-2021-JPO, 2018 WL 1578167, at *7 (S.D.N.Y.

Mar. 27, 2018) ("The Parity Act prohibits disparate coverage among only treatments that belong

in the same classification.").

Here, it is undisputed that Colin's treatment at Heritage was classified as

inpatient, out-of-network.  The Plan specifically provides that travel/lodging reimbursement is

available "only when using an in-network facility."  (See UBH at 50 ("Hotel, motel, or apartment

rental only covered when using an in-network facility . . . Travel benefits available only when

using an in-network facility").)  Thus, the benefits are not "in the same classification," because

the mental health benefits for which Colin seeks coverage are in-patient, out-of-network, while

the medical benefits he seeks to use for comparison are only available for in-network treatment.

See, e.g., Bushnell, 2018 WL 1578167, at *7 (plaintiff stated a Parity Act claim where plaintiff's

"nutritional counseling for anorexia [was] in the same classification as nutritional counseling for

diabetes"—"outpatient, out-of-network treatments").

    In response to this classification argument, Plaintiffs summarily state that "some

of [the] treatments eligible for travel and lodging reimbursement are out-of-network," but

Plaintiffs do not specify which treatments these are.  (Docket entry no. 77, at 34.)  The Court has

reviewed the portions of the Plan cited by Plaintiffs (UBH at 48–51) and can discern no Plan

provision that provides travel/lodging reimbursement for services at out-of-network facilities.

The Court further notes that, even if the in-network restriction were not present, Plaintiffs'

showing would still be deficient because they have provided no explanation of how the

categories of medical treatments eligible for travel/lodging reimbursement under the Plan (which

include cancer treatments, obesity surgery, transplants, and knee/hip/spine surgeries) are

sufficiently analogous to the residential mental health treatment for which Colin seeks coverage.

Thus, because Plaintiffs have not established a key element of their Parity Act claim, Defendants

are entitled to summary judgment on this claim and this claim (as asserted in the Fourth Cause of

Action) is dismissed.


   Parity Act – Use of the Optum Guidelines

    Plaintiffs next argue that the Plan violated the Parity Act by applying a strict set

of outside guidelines (the Optum Guidelines) to evaluate claims for mental health treatment,

while applying no such guidelines to analogous medical treatment claims.  Defendants argue that

application of the Optum Guidelines to mental health claims does not violate the Parity Act because UBH applies a similar set of outside guidelines to medical treatment claims.

The Optum Guidelines are "a set of objective and evidence-based health criteria used by medical necessity plans to standardize coverage determinations, promote evidence-based practices, and support members' recovery, resiliency, and wellbeing for behavioral health benefit plans[.]"  (UBH at 210.)  In reviewing Colin's claim for coverage, all of UBH's internal reviewers (as well as the independent external reviewer) relied upon and referenced the Guidelines in their denial explanation letters.  (Docket entry no. 72-2, at 93–94; docket entry no. 72-9, at 70–71; docket entry no. 72-9, at 26–28; docket entry no. 57-61.)  Specifically, each letter cited the portion of the Guidelines applicable to Mental Health Residential Treatment Center Level of Care.  (Id.)  The Plan specifically authorizes claims administrators to rely upon the Optum Guidelines in evaluating mental health treatment claims, stating that the Plan may exclude coverage for:

> [s]ervices or supplies for the diagnosis or treatment of mental illness . . . that, in the reasonable judgment of the Plan Administrator or its mental health/substance abuse vendor, are any of the following: [1] Not consistent with prevailing national standards of clinical practice for the treatment of such conditions[;] [2] Not consistent with prevailing professional research demonstrating that the services or supplies will have a measurable and beneficial outcome[;] [3] Typically do not result in outcomes demonstrably better than other available treatment alternatives that are less intensive or more cost-effective[; or] [4] Not consistent with the Plan Administrator's or its mental health/substance abuse vendor's guidelines or best practices as modified from time to time[.]

(UBH at 58 (emphasis added).)

To prevail on their Parity Act claim, Plaintiffs must first identify an analogous medical/surgical treatment that is in the same classification as the mental health treatment they seek.  Plaintiffs here compare the Plan's treatment of residential mental health services to the Plan's treatment of skilled nursing facility services (both of which are classified as inpatient

services).  The Court concludes that this is a sufficient analogue, based on both the Parity Act

regulations (which expressly compare residential mental health treatment to skilled nursing

facility care) and the decisions of numerous courts finding that these two types of treatment are

analogous.  See 78 Fed. Reg. 68247 (Nov. 13, 2013) ("[I]f a plan or issuer classifies care in

skilled nursing facilities or rehabilitation hospitals as inpatient benefits, then the plan must

likewise treat any covered care in residential treatment facilities for mental health or substance

use disorders as an inpatient benefit."); Vorpahl v. Harvard Pilgrim Health Ins. Co., No. 17-CV-

10844-DJC, 2018 WL 3518511, at *4 (D. Mass. July 20, 2018) (finding "skilled nursing

facilities or rehabilitation hospitals" to be sufficiently "analogous" to residential wilderness

therapy programs in motion to dismiss posture); David P. v. United Healthcare Ins. Co., No. 19-

CV-00225-JNP-PMW, 2020 WL 607620, at *17 (D. Utah Feb. 7, 2020) (noting that courts have

"consistently analogized mental health/substance abuse residential treatment centers to

medical/surgical hospice and rehabilitation facilities").

    Having identified an appropriate analogue, Plaintiffs must next demonstrate that

the Plan imposes more restrictive treatment limitations on residential mental health services than

it does on skilled nursing facility services.  To establish an unequal, nonquantitative treatment

limitation, a plaintiff must show that the Plan uses "processes, strategies, evidentiary standards,

or other factors that are applied more stringently than the processes, strategies, evidentiary

standards, or other factors used in applying the limitation with respect to medical/surgical

benefits."  David P., 2020 WL 607620, at *16 (internal quotation marks omitted) (quoting 29

C.F.R. § 2590.712(c)(4)(i)).  Treatment limitations "are not necessarily evident on the face of an

insured's plan terms," and sometimes "may be imposed during a claim administrator's

application of the plan to a given claim for benefits."  David P., 2020 WL 607620, at *15.

Plaintiffs assert that the Plan applies unequal treatment limitations because the Optum Guidelines, by their terms, only apply to mental health/substance abuse treatment claims, thus creating an extra hurdle for mental health claimants that does not exist for medical/surgical claimants seeking treatment in skilled nursing facilities.  According to this argument, while patients at skilled nursing facilities need only satisfy the Plan's basic medical necessity criteria, patients at residential mental health facilities must satisfy the medical necessity criteria plus the additional Optum Guidelines.  Defendants, however, argue that this comparison is inaccurate, proffering that UBH does utilize a set of outside guidelines for skilled nursing facilities—the MCG Guidelines.  The MCG Guidelines are used by UBH in its administration and evaluation of claims for benefits at skilled nursing facilities.  (Docket entry no. 82, at 16–17; docket entry no. 71.)  Defendants argue that, because the Plan uses outside guidelines to evaluate both claims for residential mental health treatment and skilled nursing facilities, Plaintiffs cannot show that mental health treatment is subject to more-restrictive treatment limitations.

The District of Utah recently analyzed a similar issue in L.D. v. UnitedHealthcare Ins., No. 21-CV-00121-RJS-DBP, 2023 WL 4847421 (D. Utah July 28, 2023).  The plaintiffs in L.D. brought a Parity Act challenge to their insurance plan, arguing that the defendants imposed more restrictive limitations on residential mental health centers than on skilled nursing facilities, based on defendants' use of a set of outside guidelines to evaluate mental health claims.  Id. at *17-18.  The defendants used one set of guidelines to evaluate the medical necessity of treatment at residential mental health treatment centers (the Optum Guidelines), and used another set of guidelines to evaluate the medical necessity of treatment at skilled nursing facilities (the MCG Guidelines).  Id.  To evaluate the plaintiffs' Parity Act claims, the court analyzed whether the MCG Guidelines were "comparable to and not more stringent than" the Optum Guidelines—a

question that it answered in the affirmative.  Id. at *18.  First, the court noted that the insurance

plan used the same definition of "medical necessity" for "both mental health and

medical/surgical treatment."  Id.  Second, the court noted that the two different sets of guidelines

"were developed using similar processes," as both were developed based on similar principles

like clinical evidence, medical databases, and clinical expertise.  Id. at *19.  Third, the court

concluded that any "differences between the [Optum] Guidelines and MCGs are insufficient to

show disparity," because the provisions cited by plaintiff (such as the varying admission criteria)

were either "effectively the same" in both plans (even though the plans were "not worded

identically"); or in some cases the MCG Guidelines were in fact somewhat stricter than the

analogous provisions in the Optum Guidelines.  Id.  The court noted that, for purposes of the

Parity Act, "the guidelines do not need to be identical, just comparable," and that the plaintiffs

had not carried their burden of showing that the two sets of guidelines were "materially

different."  Id.  Thus, because both guidelines interpreted "the same [basic] medical necessity

limitation" from the plan, and because both guidelines "were developed using similar processes

and applied comparably," the court held that the plaintiffs had not shown a violation of the Parity

Act and granted summary judgment in favor of the defendants.  Id.

        Other courts have similarly recognized that not every difference in plan

requirements between mental health and medical/surgical services constitutes an improper

limitation under the Parity Act.  See, e.g., Michael P. v. Aetna Life Ins. Co., No. 16-CV-00439-

DS, 2017 WL 4011153, at *7 (D. Utah Sept. 11, 2017) (noting that the "difference in [plan]

requirements" between residential mental health facilities and skilled nursing facilities was "not

necessarily an improper limitation on mental health care, but [rather] a recognition of the

inherent difference in treatment at those facilities" and that the differences noted by the plaintiffs

"may be properly based on clinically appropriate standards"); E.R. v. UnitedHealthcare Ins. Co., 248 F. Supp. 3d 348, 362 (D. Conn. 2017) ("The mere fact that the UBH Guidelines have additional criteria does not necessarily mean that the UBH Guidelines are more onerous or more restrictive.").  Examples provided in the Parity Act regulations likewise recognize that a plan which uses differing (but comparable) standards for mental health benefits and medical/surgical benefits does not necessarily violate the Parity Act, "even if the application of the evidentiary standards does not result in similar numbers of visits, days of coverage, or other benefits utilized for mental health conditions or substance use disorders as it does for any particular medical/surgical condition." 29 C.F.R. § 2590.712(c)(4)(iii).

Based upon a review of the Optum Guidelines and MCG Guidelines in the present case, the Court concludes that the two sets of guidelines do not impose materially different limitations on treatment claims for residential mental health facilities as opposed to skilled nursing facilities.  First, as noted by the court in L.D., both sets of guidelines interpret the same base language from the Plan—the medical necessity requirement.  As explained in detail above, the Plan's definition of medical necessity requires that all covered treatments be "[n]ecessary for and appropriate to" the diagnosis or treatment of a disease, "[w]ithin generally accepted standards of medical care in the community," and not provided "solely for the convenience of the employee, the employee's family or the provider."  (UBH at 203 (defining "Medically Necessary".)

Second, both sets of guidelines represent that they were developed using similar processes and principles.  The Optum Guidelines describe themselves as "objective and evidence-based behavioral health criteria" based upon clinical expertise and medical evidence, and the MCG Guidelines state that they are based upon published medical evidence, clinical

expertise, and objective data.  (UBH at 210); see also L.D., 2023 WL 4847421 at *19.  Third, while the Optum guidelines applicable to residential mental health facilities and the MCG guidelines applicable to skilled nursing facilities are not identical, the treatment limitations in the Optum Guidelines are not materially more stringent.  Both guidelines focus on only admitting patients who have intense care needs that require treatment by skilled professionals in a residential setting, and both require that the patient's needs could not be safely and effectively met at a lower level of care.

As for "continued stays" under the Optum Guidelines, a continued stay is appropriate when the common admission criteria continue to be met, and when "[t]reatment is not primarily for the purpose of providing custodial care."  (UBH at 224.)  For "extended stays" under the MCG Guidelines, an extended stay is appropriate when there continue to be "█████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████

(Docket entry no. 71-2, at 10.)  In this case, the MCG Guidelines appear to impose even stricter requirements than the Optum Guidelines—while the Optum Guidelines only include the additional requirement that treatment not be custodial in nature, the MCG Guidelines include the stringent requirement that the patient ████████████████████████████████ as enumerated in a highly specific list.  Moreover, while the Optum Guidelines do not impose any numerical limits on the length of a patient's stay, the MCG Guidelines define an extended recovery stay as "████████████████████████████████████████"

and provide a list of percentiles for average length of stay that providers may utilize as targets. (Docket entry no. 71-2, at 9–10.)

Plaintiffs argue that the Optum Guidelines and the MCG Guidelines are fundamentally not comparable because the Optum Guidelines are specifically authorized in the language of the Plan and because they set out "mandatory requirements," while the MCG Guidelines are not mentioned at all in the Plan.  (See docket entry no. 77, at 28–29.)  The Court is not persuaded that this distinction is meaningful.  First, Plaintiffs cite no case law in support of these arguments.  Moreover, Plaintiffs are mistaken about the "mandatory" nature of the Optum Guidelines—while the Plan does authorize claims administrators to rely on the Optum Guidelines in making coverage determinations, the Plan does not require the use of the Optum Guidelines.  The Plan provides that, in making a coverage decision for mental health treatment, an administrator may deny a claim because it is, inter alia, "[n]ot consistent with the Plan Administrator's or its mental health/substance abuse vendor's guidelines or best practices as modified from time to time."  (UBH at 58 (emphasis added).)  The Plan also lists many other reasons for which a claim might be denied—for example, a claim might be denied if the treatment is "[n]ot consistent with prevailing national standards of clinical practice," or "[n]ot consistent with prevailing professional research."  (Id.)  Thus, the Plan in no way requires that administrators use the Optum Guidelines in evaluating claims for mental health treatment, as treatment coverage may be denied for a whole host of reasons—inconsistency with the Optum Guidelines is just one of these potential reasons.  See Halberg v. United Behav. Health, 408 F. Supp. 3d 118, 167 (E.D.N.Y. 2019) (citation omitted) (concluding that the insurance plan did not err in failing to utilize the Optum Guidelines while evaluating the plaintiff's claim for coverage

of RTC treatment, as the plaintiff had "fail[ed] to identify . . . any rule, regulation, UBH []

provision, or any plan provision that requires reviewers to consider [the Optum Guidelines]").

In sum, though the two sets of guidelines presented here are not identical, they

both operate within the same definition of medical necessity contained in the Plan, and they do

not impose materially different requirements in the contexts of skilled nursing care and

residential mental health care.  Thus, Plaintiffs have not carried their burden of proving a Parity

Act violation, and Defendants are entitled to summary judgment dismissing this claim (as

asserted in the First Cause of Action).

C<small>ONCLUSION</small>

For the reasons explained above: (1) both Plaintiffs' and Defendants' motions for

summary judgment on Plaintiffs' benefit-denial claim under ERISA (as asserted in the Fifth

Cause of Action) are denied; (2) Defendant's motion for summary judgment dismissing

Plantiffs' Parity Act claims (as asserted in the First and Fourth Causes of Action) is granted; and

(3) Plaintiffs' motion for summary judgment on the Parity Act claims (as asserted in the First and

Fourth Causes of Action) is denied.

The parties are directed to meet with Magistrate Judge Gabriel W. Gorenstein for

settlement purposes regarding the ERISA benefit-denial claim.  If the parties are unable to reach

an agreement within 60 days (by November 28, 2023), the parties are further directed to meet

and confer, and to make a joint submission by December 28, 2023 addressing the following

issues: whether the parties consent to a summary trial on the stipulated administrative record,

allowing the Court to decide any disputed issues of fact (i.e., a "motion for judgment on the

administrative record"), and whether the parties believe supplementation of the administrative

record is necessary.  If either party believes supplementation is necessary, that party should

specify in the joint submission what additional evidence this Court should consider, how the party intends to provide that evidence to the Court, if permitted to do so, and why good cause exists to expand the administrative record.  See  Halo v. Yale Health Plan, Dir. of Benefits & Recs. Yale Univ., 819 F.3d 42, 60 (2d Cir. 2016) (quoting DeFelice v. Am. Int'l Life Assurance Co., 112 F.3d 61, 66 (2d Cir. 1997)) (noting that, although district courts have discretion to admit additional evidence when reviewing claim denials under ERISA, regardless of the standard of review, that discretion "ought not to be exercised in the absence of good cause").

This Memorandum Opinion and Order resolves docket entry nos. 51 and 63.

SO ORDERED.

Dated: September 30, 2023
      New York, New York

                                 /s/ Laura Taylor Swain
                                LAURA TAYLOR SWAIN
                                Chief United States District Judge